# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

---

Nº 07-CV-4442 (JFB)

---

KERRY KOTLER,

Petitioner,

VERSUS

ROBERT WOODS, SUPERINTENDENT OF UPSTATE CORRECTIONAL FACILITY,

Respondent.

---

**MEMORANDUM AND ORDER**
April 15, 2009

---

JOSEPH F. BIANCO, District Judge:

Petitioner Kerry Kotler (hereinafter, "Kotler" or "petitioner") petitions this Court for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254, challenging his conviction in state court. Petitioner was convicted in a judgment rendered on October 23, 1997, following a jury trial, in the County Court of the State of New York, Suffolk County. Petitioner was convicted of Rape in the First Degree and sentenced to a period of incarceration of seven to twenty-one years.

Petitioner challenges his conviction on the following grounds: (1) that he was denied judicial oversight, his right to be present, and access to counsel at trial; (2) that the trial court admitted hearsay testimony and out-of-court statements in violation of petitioner's due process and confrontation rights; (3) that the destruction of highly material evidence by the State violated petitioner's due process rights; and (4) that the jury was not a fair, random cross-section of the community.

For the reasons set forth below, petitioner's request for a writ of *habeas corpus* is denied in its entirety. First, petitioner has failed to demonstrate that his constitutional right to be present was violated in connection with an exhibit list or a jury deadlock note. Second, petitioner has failed to demonstrate that a "911" tape was given to the jury during deliberations or, even if it was, that he was denied his constitutional right to a fair trial. Third, petitioner has failed to demonstrate that his right to counsel was hindered in any way by the trial court's admonitions to petitioner about talking while

the trial court was speaking. Fourth, the admission of certain inadmissible hearsay does not amount to constitutional error warranting *habeas* relief where the evidence of petitioner's guilt in the underlying crime of rape was overwhelming – including (1) DNA evidence establishing the presence of petitioner's semen on the victim's skirt and on vaginal swabs taken from the victim; (2) the matching of the victim's description of the vehicle in which she was taken and a partial license plate to the vehicle registered to petitioner's girlfriend and driven by petitioner; and (3) petitioner's activities in the early morning hours of August 12, 1995 placed him in the path of the area where the victim was abducted and the location where she was dropped off. The defendant's theory that the defendant's semen was found on the victim's skirt because detectives planted the evidence by taking semen from a condom found in the defendant's garage at his house was fully explored by defense counsel during the trial and rejected by the jury in light of the overwhelming evidence of petitioner's guilt. Thus, the admission of certain inadmissible hearsay was harmless. Fifth, petitioner's claims of *Rosario* violations do not provide a basis for *habeas* relief because any such violations did not violate his constitutional rights, including his rights under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, and, in any event, were properly addressed by the trial court. Finally, petitioner's claim regarding jury selection based upon the over-representation of nurses on the jury panel is procedurally barred and, in any event, is without merit, because, among other things, nurses are not a distinct class, over-representation of a group (without under-representation of another group) does not itself raise constitutional implications, and petitioner has not established a basis for an equal protection violation. In short, as

discussed in detail below, the Court has reviewed all of petitioner's claims and finds them to be without merit.

## I. BACKGROUND

### A. Facts

The following facts are adduced from the underlying record.

#### 1. Summary of Testimony at Trial by Prosecution Witnesses

##### a. Kathleen O'Shea

During the summer of 1995, Kathleen O'Shea ("O'Shea") worked as a waitress at the Beach Bar in Hampton Bays ("Beach Bar"). (Trial Transcript ("Tr.") 1961.) O'Shea was a college student from upstate New York who was living with her friend Missy Renck ("Renck") for the summer. (Tr. 1961.) On Friday, August 11, 1995, O'Shea returned from work to Renck's home in Mastic, New York, where they prepared to go out that evening (Tr. 1962.) O'Shea borrowed a black skirt, a denim vest, and shoes from Renck. (Tr. 1962-63.) O'Shea and Renck arrived at the Beach Bar at approximately 12:30 a.m. on August 12, 1995. (Tr. 1963.) Renck left the Beach Bar with a friend of hers, and O'Shea left the bar alone between 3:00 and 3:30 a.m. (Tr. 1965.)

After leaving the bar, O'Shea drove towards Sunrise Highway to travel west back to Mastic. (Tr. 1967.) As O'Shea was exiting the highway, she noticed headlights flashing in her rearview mirror from a car behind her. (Tr. 1967.) The car then pulled alongside her car, and the man inside displayed a badge and motioned to her to pull

over to the side of the road. (Tr. 1968.) O'Shea drove her car a short distance, and the other car pulled behind her. (Tr. 1969.) The man got out of his car and approached O'Shea's vehicle on the driver side. After displaying his badge, the man advised O'Shea that she was "all over the road" and wanted to give her a "drunk test." (Tr. 1969.) When the man said he was going to call for backup, O'Shea got out of her car and pleaded for him not to call backup. At this point, the man said they needed to move their cars because they were in the way of traffic. (Tr. 1970.) He pulled his car over, and O'Shea pulled in behind him. O'Shea stepped out of her car and asked to see the man's badge again, and he walked back to his car. She noticed that the man had a ponytail. (Tr.1972.)

When the man came back to O'Shea's car, he grabbed her around the neck and put a serrated knife in her side. (Tr. 1972, 1978.) The assailant pulled O'Shea from the doorway of her car and shut the door with his foot. (Tr. 1972.) O'Shea started to scream, but her assailant covered her mouth and forcibly put her into his car. (Tr. 1973.) He told her to keep her "head down at all times." (Tr. 1973.) O'Shea kept her head down, and her hair was covering her face. She noted from the emblem on the dashboard that the car was a Grand Am, and that the inside of the car was a light blue or light gray color. (Tr. 1975.) O'Shea attempted to lift her head, but her assailant smacked her "right upside the head." (Tr. 1975.)

The assailant eventually stopped the car, pulled O'Shea out, and told her to keep her hair in front of her face. (Tr. 1978.) O'Shea was led into a wooded area and told to undress. (Tr. 1979.) She was told to get on her hands and knees, and she felt her assailant put his penis inside her vagina. (Tr. 1980.)

O'Shea's assailant ejaculated inside her, and he then rolled her onto her back and started to squirt a liquid inside her vagina using a squeeze bottle. (Tr. 1980.) O'Shea expressed concern that the liquid smelled like gasoline and that her assailant was going to burn her, so she asked him to squirt some of the liquid into her hand so she could smell it. (Tr. 1980-81.) O'Shea's assailant stated that he was squirting the liquid so that if he was ever caught, there would be no evidence. (Tr. 1981.)

After putting on her vest and shoes, and carrying the rest of her clothes, O'Shea was led back to the car and told to keep her head down. As she approached the car, she was able to observe part of the New York license plate – G55 1D, and perhaps a 9. (Tr. 1982.) She also saw that it was a New York license plate and that the car was white. (Tr. 1983.) O'Shea was driven to a residential area, and her assailant told her to run to an area with weeds, count to sixty, and that if she did not count to sixty, he would come back and kill her. (Tr. 1984.) She ran to a nearby Amoco gas station, where she made a series of other calls to friends and also called 911. (Tr. 1988.)

An officer arrived at the gas station, and O'Shea told him what happened. She gave the officer the partial license plate number that she saw on her assailant's car, and told the officer that it was a white two-door Grand Am. (Tr. 1990-91.) O'Shea described her assailant as a white male, with a ponytail, five feet nine and one-half inches tall. She thought at the time that his hair was strawberry blond. (Tr. 1991.)

O'Shea met Detective Robert Titolo ("Titolo"), who also came to the gas station, and they went to the area where O'Shea was

dropped off. (Tr. 2003.) They then attempted to locate the area where the attack occurred, but were unsuccessful. (Tr. 2003.) O'Shea was then taken to Stony Brook University Hospital, where she was examined with a rape kit. (Tr. 2005.) While she was at the hospital, Titolo questioned O'Shea about the incident. (Tr. 2004.)

The next day, O'Shea met with Titolo, who came to her house. Detective Titolo showed car books to O'Shea, and she identified the Grand Am as having been produced in either 1988 or 1989. (Tr. 2008.) O'Shea then went to Yaphank to assist the police in creating a composite sketch of her assailant, but she was unable to do so. (Tr. 2008-09.)

On September 25, 1995, O'Shea was taken by the police to the Property Bureau of the Suffolk County Police Department and "walked right up to a car" because it was "the exact, shape, style, color and everything of the car" in which she was taken. (Tr. 2011.) O'Shea also noticed that the license plate started with "G55 1." (Tr. 2011.) O'Shea sat in the car in the impound lot, with her head between her legs, as she did on the evening she was attacked. She was able to see the Grand Am symbol, and the color of the interior, as she had the night of the attack. (Tr. 2016.)

### b. Dennis Lawlor

Dennis Lawlor worked for the Suffolk County Police Department as a 911 operator on August 12, 1995. At approximately 4:56 a.m., he received a call reporting a rape. (Tr. 1838.) The tape of the 911 call was played for the jury. (Tr. 1841.)

### c. David Cherkes

Police Officer David Cherkes testified that he was on duty in the early morning hours of August 12, 1995 when he received a radio call to respond to the Amoco gas station at Exit 58 of the Long Island Expressway in Islandia. (Tr. 2197.) Cherkes arrived at 4:57 a.m. and saw O'Shea, and observed that she was visibly shaken, crying, her hair was "kind of a mess," and she was "obviously very upset." (Tr. 2197.) She was wearing a blue denim top that went down to her upper thighs, and there was a small pile of clothing on the curb next to the pay phone where she was standing. (Tr. 2198.) O'Shea spoke very fast and it was difficult to get information from her, but he ascertained that she was the victim of a rape. (Tr. 2199.) Cherkes put out a local notification of the partial license plate, and other officers arrived shortly thereafter. (Tr. 2199.) Cherkes had jotted the partial license plate on a piece of paper, but he no longer had the piece of paper at the time of trial. (Tr. 2205.) He retrieved an empty brown cardboard box from inside the gas station and collected the clothing using his pen. The clothing consisted of a bra, a pair of underpants, and a skirt, and they were put into the back of Sergeant Bob Kellenberger's vehicle. (Tr. 2200.)

### d. David Ramirez

David Ramirez was a dispatcher with the Suffolk County Police Department on August 12, 1995. He dispatched a rape at 4:47 a.m. and was requested by the responding officer to make a county-wide notification of the partial license plate, "G55 19." (Tr. 2232.)

### e. Robert Titolo

Detective Robert Titolo was the lead detective on this case. He arrived at the Amoco gas station at approximately 5:00 a.m. on August 12, 1995 and observed that Kathleen O'Shea was crying and "[j]ust totally upset" (Tr. 2507.) After taking the box containing clothes from Sergeant Kellenberger's car and placing it in his trunk, Titolo accompanied O'Shea to the area where she was dropped off by her assailant and then to Stony Brook University Hospital. (Tr. 2510.) At the hospital, O'Shea described her assailant as "a white male, five foot ten, thin build, strawberry blond colored hair in a ponytail," approximately twenty-three to thirty years of age. (Tr. 2512.)

After driving O'Shea to her car, Titolo returned to the Fourth Precinct and logged the clothes and rape kit, which he had transported in his car, with the Suffolk County Crime Lab. (Tr. 2518.) On August 13, 1995, he took a book containing photographs of cars to O'Shea's house, but she was unable to make a positive identification. She did show him, however, the "kind of car it was and the years that she felt it was," which were 1986-1989. (Tr. 2532.) On August 15, 1995, Titolo traveled with Detective Centorelli to Montauk to look for a white Pontiac Grand Am registered to Kelly Norman. (Tr. 2539.) The detectives arrived in Montauk at about 4:30 p.m. (Tr. 2531.) In order to seek assistance in locating Benson Road, they went to the East Hampton Town Police Department. (Tr. 2541.) At approximately 4:45 p.m., the detectives, along with East Hampton Police Officer Chris Anderson ("Anderson"), arrived at Benson Road. (Tr. 2543.) They traveled to 8 Du Val Place, but did not see the vehicle. (Tr. 2543.)

As the detectives were leaving, Titolo saw the white Pontiac Grand Am and followed it to the driveway at 8 Du Val Place. (Tr. 2544.) Inside the vehicle was petitioner and a German Shepherd dog. (Tr. 2545.) Titolo introduced himself and told petitioner that the vehicle was involved in an investigation. (Tr. 2546.) Petitioner stated that he was not the owner of the vehicle, and that Kelly Norman owned the car, but was not home. (Tr. 2546.) Titolo asked petitioner for his name, and petitioner replied, "Kerry." (Tr. 2546.) Titolo asked petitioner where the vehicle had been the previous Friday night, and petitioner stated that it was in the driveway of 8 Du Val Place. (Tr. 2546.) As they pulled out of the driveway, Anderson stated, "That's Kerry Kotler." (Tr. 2547.)

Titolo maintained surveillance on 8 Du Val Place and that evening saw petitioner wearing his hair in a ponytail. (Tr. 2548.) A search warrant was prepared for the Pontiac Grand Am, and it was executed at approximately 4:30 a.m. to 5:00 a.m. on August 16, 1995. (Tr. 2549.)

Detective Titolo stated that, when he prepared his written reports, he first dictated the reports into a tape recorder, which were placed onto standard audio cassettes and then given to secretaries to type. (Tr. 2568.) The dictation tapes were subsequently re-used and were not available at the time of trial. (Tr. 2569.)

### f. Philip Venturini

Philip Venturini ("Venturini") knew petitioner and saw him in Montauk on August 11, 1995. (Tr. 2279.) Venturini offered petitioner some hot dogs, but petitioner declined, stating that he would

pick them up later that evening. In a telephone conversation at 9:00 p.m. that evening, petitioner told Venturini that he would not be able to pick them up because he had to "go up island." (Tr. 2282)

### g. David Rey

David Rey was employed by the New York State Police in Albany. (Tr. 2428.) His agency was requested by the Suffolk County Police Department to run a search of a partial license plate of "G55" on a white Pontiac. (Tr. 2431.) The result of that search yielded sixty-three vehicles. (Tr. 2436.)

### h. Reinhardt Anderson

Suffolk County Detective Investigator Reinhardt Andersen testified that he took the list of sixty-three vehicles and reviewed the vehicle identification numbers with the assistance of a computer program. (Tr. 2447.) Andersen was able to ascertain that seventeen Grand Ams were on that list. Of those, seven were two-door Grand Ams. Of the two-door vehicles, four were of the model years 1985 through 1991. (Tr. 2448.) There was only one vehicle that matched all of those characteristics with a plate beginning "G55 1." (Tr. 2455.)

### i. Chris Allen

Chris Allen was a Special Agent with the Federal Bureau of Investigation in Washington and testified as an expert in hair and fiber analysis. (Tr. 2923.) He stated that the hairs that came from the victim's clothing were consistent with known hair coming from petitioner's German Shepherd dog. (Tr. 2939.)

### j. Simon Tizes

Dr. Simon Tizes examined O'Shea in the emergency room of Stony Brook University hospital on August 12, 1995. (Tr. 3085.) She noted that O'Shea had abrasions on her feet and lower legs and an "abrasion located at the entrance of her vaginal area," which was consistent with vaginal trauma. (Tr. 3087-89.) She also noted that O'Shea "had a kind of a white medium consistency discharge from her vaginal area," which "seemed as though it was seminal and vaginal fluid mixed." (Tr. 3089.)

### k. Thomas Zaveski

Dr. Thomas Zaveski, a forensic scientist with the Suffolk County Criminalistics Laboratory, testified as an expert in hair and fiber examination and comparison. (Tr. 3133.) He stated that a pubic hair on the black skirt was dissimilar to either O'Shea or petitioner.

### l. Joseph Galdi

Dr. Joseph Galdi, a forensic scientist with the Suffolk County Criminalistics Laboratory, testified as an expert in DNA RFLP analysis. (Tr. 3170.) He testified that the DNA found in the semen on the vaginal swabs from the rape kit matched petitioner's DNA profile, and that profile "occurred approximately one in twelve million two hundred thousand Caucasion population, one in a hundred seventy-nine million of the black population, and one in fifteen million one hundred thousand of the Hispanic population of the United States." (Tr. 3208.) The DNA found in the semen on Kathleen's skirt matched petitioner's DNA profile, and that profile occurred in "approximately one in six hundred eighty-one million of

Caucasion population, one in ten billion one hundred million of the black population and one in one billion one hundred twenty million of the Hispanic population of the United States." (Tr. 3218.)

### m. Robert Martin

Robert Martin was a commercial fisherman with a boat in Oceanside, on which petitioner worked. (Tr. 3256, 3264.) On the morning of August 12, 1995, petitioner called Martin at about 5:15 a.m. to advise him that he was "running a little bit late, that he was on his way." (Tr. 3267.) Petitioner arrived at approximately 5:30 a.m., and petitioner was known to drive both a Chevrolet Nova and a white Pontiac. (Tr. 3267-68.)

### n. Bruce Croce

Bruce Croce, a Suffolk County Police Detective, testified that he drove from Exit 58 of the Long Island Expressway to the dock in Oceanside, and that trip took forty-nine minutes. (Tr. 3293.)

### o. Jack Ballantyne

Jack Ballantyne, the Chief Forensic Scientist of the Suffolk County Crime Lab, testified that he viewed as a "reasonable working hypothesis" that the source of the bacteria in the skirt sample was from soil and botanical debris. (Tr. 3466.) He did not identify the type of bacteria, however. (Tr. 3466.) He testified that finding such bacterial bands is not unprecedented and occur in approximately two to five percent of the cases in which the Crime Lab is involved. (Tr. 3467.)

### p. Edward Bottone

Edward Bottone, a microbiologist, testified that it was his opinion that the bacteria present in the skirt was of vaginal origin. (Tr. 3451-52.)

### 2. Summary of Testimony at Trial by Defense Witnesses

### a. Edward Blake

Dr. Edward Blake testified that he examined cuttings taken from O'Shea's skirt and opined that "the finding of a large quantity of spermatozoa combined with the extraordinary quantities of bacteria in these samples suggests very strongly that the semen was incubated in a liquid environment for a period of time before the sample was deposited on the skirt." (Tr. 3666.) He stated that the bacteria could have grown in a condom in which semen was present. (Tr. 3667.)

### b. William Ferris

Assistant District Attorney William Ferris ("ADA Ferris") was in charge of the investigation during part of August 1995. (Tr. 3819.) He was also involved in petitioner's previous case on two rape charges, in which he was convicted and, after spending almost twelve years in jail, was released from prison after a successful C.P.L. § 440.10 motion in which the judge found by clear and convincing evidence that he was innocent. (Tr. 3821-22.) In response to questions by defense counsel, which were focused on establishing bias within Suffolk County law enforcement, ADA Ferris stated that, despite the court decision vacating the conviction, he still believed petitioner was guilty of the prior rape charges. (Tr. 3854-

57.)

### c. Randall Hinrichs

The following was stipulated by the prosecution and the defense:

> It is stipulated that if C. Randall Hinrichs were called as a witness, he would testify that on April 27th, 1997, Jack Ballantyne told Mr. Hinrichs that in his opinion the large amount of bacteria on the stains from the skirt that caused the bacterial bands on the autorads did not come from Kathleen O'Shea's vaginal canal because that amount of bacteria is not found on the vaginal swabs. Further, he told Mr. Hinrichs in his opinion that assuming the same source of the bacteria, the large amount of bacteria found on the skirt stains would be on the vaginal swab.

(Tr. 3882-83.)

### d. Dr. Bruce Hanna

Dr. Bruce Hanna testified that the bacteria on the stains on the skirt did not originate from the vaginal drippings of the victim. (Tr. 3900-01.)

### B. Procedural History

On June 11, 1997, petitioner was charged with one count of Rape in the First Degree, to which he pled not guilty. A pretrial motion to suppress petitioner's statements to law enforcement was denied following a pretrial hearing in the County Court, Suffolk County.

On July 18, 1997, following a jury trial, petitioner was convicted of one count of rape in the first degree. Petitioner was sentenced on October 23, 1997 to an indeterminate term of seven to twenty-one years incarceration. On that date, petitioner filed a N.Y. C.P.L. § 330.30 pre-sentence motion to vacate the jury verdict, which the trial court refused to entertain because the motion was filed *pro se* while petitioner was represented by counsel. In addition, petitioner filed a N.Y. C.P.L. § 440.10 post-conviction motion to vacate judgment. This motion was denied on June 1, 1998.

Petitioner filed an appeal of his conviction to the Appellate Division, Second Department, wherein he raised the following issues: 1) that his conviction was not supported by sufficient evidence; 2) that the trial court did not properly address the deliberating jury's inquiries; 3) that his rights under the Confrontation Clause were violated; 4) that the trial court did not properly address *Rosario* issues that arose during his trial; 5) that errors committed during jury selection deprived him of a fair trial; 6) that the trial court erred when it denied his request to adjourn sentencing; and that 7) the interests of justice require reversal of his conviction. Petitioner's conviction was affirmed by the Appellate Division on July 25, 2006, and the New York State Court of Appeals denied petitioner leave to appeal on October 30, 2006. *See People v. Kotler*, 31 A.D.3d 787 (N.Y. App. Div. 2006), *leave to appeal denied*, 7 N.Y.3d 868 (N.Y. 2006). He did not file a petition for writ of certiorari with the United States Supreme Court.

On or about October 2, 2007, petitioner filed this writ of *habeas corpus* in the United States District Court for the Northern District of New York. Petitioner's matter was transferred to this Court on October 18, 2007, because the site of petitioner's trial and sentencing was Suffolk County. Respondent submitted his opposition on December 10, 2007, and petitioner's reply was filed on February 4, 2008. The Court has fully considered all of the submissions of the parties.

## II. STANDARD OF REVIEW

To determine whether petitioner is entitled to a writ of *habeas corpus*, a federal court must apply the standard of review set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which provides, in relevant part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2554. "Clearly established Federal law" is comprised of "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

A decision is "contrary to" clearly established federal law, as determined by the Supreme Court, "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.*

AEDPA establishes a deferential standard of review: "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Williams*, 529 U.S. at 411). The Second Circuit added that, while "[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest

judicial incompetence." *Gilchrist*, 260 F.3d at 93 (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)). Finally, "if the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed findings of fact and conclusions of law are reviewed *de novo.*'" *Dolphy v. Mantello*, 552 F.3d 236, 238 (2d Cir. 2009) (quoting *Spears v. Greiner*, 459 F.3d 200, 203 (2d Cir. 2006)).

## III. DISCUSSION

### A. Procedural Bar

As a threshold matter, respondent argues that petitioner's claims regarding (1) the Confrontation Clause and (2) the over-representation of nurses in his jury panel, are procedurally barred from *habeas* review by the Court. The Court finds that petitioner's jury composition challenge is barred, but that his Confrontation Clause challenge is not procedurally barred.[1]

The procedural bar rule in the review of applications for writs of *habeas corpus* is based on the comity and respect with which state judgments must be accorded. *House v. Bell*, 547 U.S. 518, 535 (2006). The Supreme Court has held that claims underlying a *habeas* petition may be procedurally barred from *habeas* review if they were decided at the state level on adequate and independent procedural grounds. *Coleman v. Thompson*, 501 U.S. 722, 729-33 (1991). The purpose of this rule is to maintain the delicate balance of federalism by retaining a state's rights to enforce its laws and to maintain its judicial procedures as it sees fit. *Id.* at 730-31.

---

[1] In any event, both claims are denied on their merits, as discussed *infra*.

In particular, the procedural bar applies when a state court's decision contains a "plain statement" that it is relying on an appropriate state law to deny a claim. *Michigan v. Long*, 463 U.S. 1032, 1042 (1983). The Supreme Court has consistently applied the *Long* rule since it was established. *See Harris v. Reed,* 489 U.S. 255, 261 (1989); *see also Ohio v. Robinette,* 519 U.S. 33, 37 (1996); *Pennsylvania v. Labron,* 518 U.S. 938, 941 (1996); *Arizona v. Evans,* 514 U.S. 1, 7 (1995); *Coleman,* 501 U.S. at 723; *Delaware v. Van Arsdall,* 475 U.S. 673, 678 (1986). The rule applies both to substantive and procedural state laws. *See, e.g.*, *Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985) (applying the *Long* "plain statement" rule to a procedural state law). Further, "the state court must actually have relied on the procedural bar as an independent basis for its disposition of the case." *Id.*

With regard to petitioner's claims in this case, "[b]ecause the Court of Appeals denied leave to appeal, this Court must look back to the last reasoned decision," specifically the Appellate Division's decision that affirmed petitioner's judgment of conviction on direct appeal. *Harvey v. Mazzuca*, No. 04 Civ. 8019 (PKC), 2006 WL 1529325, at *7 (S.D.N.Y. May 12, 2006); *see also Ylst v. Nunnemaker*, 501 U.S. 797, 802 (1991) (stating that where last reasoned opinion on claim explicitly imposes procedural default, it should be presumed later decision rejecting claim did not silently disregard bar and consider merits); *Levine v. Comm'r. of Corr. Svcs.*, 44 F.3d 121, 126 (2d Cir. 1995) (same).

### 1. Confrontation Clause

Here, respondent argues that petitioner's

objection to the introduction of hearsay testimony as violative of the Confrontation Clause is unpreserved, because the defendant had not specifically cited the Confrontation Clause in his objection at trial and instead objected only on hearsay grounds. (Respondent's Memorandum of Law, at 25.) New York's contemporaneous objection rule requires a specific objection at trial to any constitutional violation. *See, e.g., Garvey v. Duncan*, 485 F.3d 709, 715-16 (2d Cir. 2007) (finding New York contemporaneous objection rule to be firmly established and regularly followed such that failure to comply with it could result in a procedural bar); *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990); *Royster v. Ercole*, No. 06 Civ. 12942 (SAS) (JCF), 2008 WL 542505, at *7 (S.D.N.Y. Feb. 29, 2008) ("Under C.P.L. § 470.05(2), the petitioner was required to make a specific constitutional objection to the introduction of the hearsay testimony at issue during trial to preserve his claim for appellate review.") (citations omitted); *People v. Kello*, 96 N.Y.2d 740, 743-44 (N.Y. 2001) ("Defendant, however, never based his trial objection to the 911 tapes on the Confrontation Clause. Rather, the only issue raised before the trial court was the erroneous admission of the tapes under our State common-law hearsay rule . . . . The defendant's failure to raise a Confrontation Clause objection precluded the trial court and prosecution from considering and, thus, avoiding any constitutional error which, as previously discussed, differs from the trial evidence error which was preserved."); *People v. Lopez*, 25 A.D.3d 385, 386 (N.Y. App. Div. 2006) ("Although defendant's trial occurred before the decision of the United States Supreme Court in [*Crawford v. Washington*, 541 U.S. 36 (2004)], that circumstance does not affect defendant's obligation to make a proper constitutional claim, as opposed to a claim grounded in state evidentiary law."); *People v. Mackenzie*, 808 N.Y.S.2d 919, 919 (N.Y. App. Div. 2005) (noting that Confrontation Clause challenge "must be interposed with specific reference to the constitutional protection").

However, even though respondent also made this procedural argument on appeal in the state proceedings, the Appellate Division did not expressly hold that Kotler's claim was procedurally barred. In particular, the Appellate Division's decision did not explicitly refer to petitioner's Confrontation Clause challenge, and it simply stated that "his remaining contentions are without merit." *Kotler*, 31 A.D.3d at 788. Thus, because the appellate court did not deny petitioner's claim on this adequate and independent procedural state ground under New York law, this Court will review his claim on the merits and, for the reasons discussed *infra,* finds it to be without merit.

2. Jury Composition

With respect to petitioner's jury composition claim, the County Court of Suffolk County rejected petitioner's post-conviction motion, and the Appellate Division, hearing the case by permission, held that the "[t]he defendant's contention relating to the composition of the jury panel is unpreserved for appellate review." *Kotler*, 31 A.D.3d at 788. Thus, the Appellate Division explicitly dismissed petitioner's claim as unpreserved under New York law. Although petitioner had raised the argument previously in a motion to vacate the judgment of conviction pursuant to C.P.L. § 440.10, petitioner's claims cannot be raised in a C.P.L. § 440.10 motion as a substitute for direct appeal under New York law. In

addition, even though petitioner argues that he first raised his claims regarding jury selection in a post-verdict motion filed *pro se* pursuant to C.P.L. § 330.30, this point is irrelevant to the fact that he failed to properly preserve his claim on direct appeal.

The Appellate Division correctly held that petitioner's claim was unpreserved. New York C.P.L. § 270.10 requires a criminal defendant to make a motion challenging the composition of the jury trial in writing, before commencement of jury selection. *See, e.g.*, *People v. Faulkner,* 673 N.Y.S.2d 715, 716 (N.Y. App. Div. 1998) ("By failing to comply with the requirements of CPL 270.10, the defendant waived any objections he may have had to the composition of the jury panel"); *People v. Hammock,* 681 N.Y.S.2d 184, 185 (N.Y. App. Div. 1998) ("By failing to challenge the composition of the jury panel before jury selection commenced, defendant is deemed to have waived his objection to the composition of the panel"); *People v. Davis*, 522 N.Y.S.2d 1017, 1019 (N.Y. Sup. Ct. 1987) ("[T]he C.P.L. requirement that challenges to the jury be made 'before the selection of the jury commences' is not met when the motion is made after even a single panel of prospective jurors has been sworn and informed of the nature of the indictment."). In *Consolazio*, the Court of Appeals held that an oral motion prior to jury selection was inadequate to satisfy C.P.L. § 270.10, even if written notice is given after jury selection is completed. 40 N.Y.2d at 455; *see also People v. Dukes*, 97 A.D.2d 445 (N.Y. App. Div. 1983) (stating that an oral motion to challenge the jury panel does not preserve the issue for later review). The Court of Appeals further held that C.P.L. § 270.10(2) applies to "all challenges to the panel, whatever may be the particular ground advanced." *Consolazio*, 40 N.Y.2d at 455.

Because Kotler failed to raise his objections to jury selection in a written motion, made before the commencement of jury selection, his claims fail as a matter of state law under C.P.L. § 270.10. Thus, in the instant case, the Appellate Division's rejection of petitioner's claim was properly based on an adequate and independent state ground. *See, e.g., People v. Consolazio*, 40 N.Y.2d 446 (N.Y. 1976); *People v. Parks*, 41 N.Y.2d 36 (N.Y. 1976).

Once it is determined that a claim is procedurally barred under state rules, a federal court may still review such a claim on its merits if the petitioner can demonstrate both cause for the default and prejudice resulting therefrom, or if he can demonstrate that the failure to consider the claim will result in a miscarriage of justice. *Coleman*, 501 U.S. at 749-50 (citations omitted). A miscarriage of justice is demonstrated in extraordinary cases – for example, where a constitutional violation results in the conviction of an individual who is actually innocent. *Murray v. Carrier*, 477 U.S. 478, 495 (1986).

In this case, petitioner seems to argue that his "cause" for default was that he "was unaware that an anomaly had occurred" and "could not have been expected to set forth facts constituting the grounds for a challenge prior to the commencement of jury selection" when he had "a right to proceed up to jury selection upon a presumption of regularity in the process." (Petitioner's Memorandum of Law in Support of Writ of Habeas Corpus ("Petition"), at 34.) Indeed, petitioner does not dispute that he failed to make the required motion under C.P.L. § 270.10. (Petition, at 34.) Nevertheless, petitioner has failed to provide a satisfactory explanation for his failure to raise his objections in a

timely fashion. The record clearly indicates that the trial court agreed and did not view petitioner's request as timely: "You haven't made your challenge in advance." (Tr. 772.) Petitioner and his counsel were well aware of the possibility that they would find the panel objectionable, as reflected by petitioner's trial counsel's statement on the record: "Judge, I understand that the CPL says that you're supposed to challenge the array beforehand." (Tr. 772-73.) Along these lines, prior to the start of jury selection, petitioner had the opportunity to solicit, for example, the juror source list information that his attorney requested by letter dated August 15, 1997. (*See* Appellate Court Appendix, at A-63.) Instead, petitioner waited until a month after his conviction to request this information.

There is also no explanation provided as to why, at the very least, petitioner failed to make his objections in writing once he and his counsel became aware of the jury panel's composition. Because petitioner challenges the entire jury panel and the process by which such prospective jurors were selected, it is clear that any objections to that panel must be made, in writing, prior to the selection of the jury, in order to provide a potential opportunity for a hearing or briefing on the matter before the trial continues. *See People v. Parks*, 41 N.Y. 2d 36, 40 (N.Y. 1976) ("The evident purpose of the writing requirement is to ensure that the District Attorney and the court have sufficient time to prepare for hearing to resolve disputed issues of fact and law . . . . The requirement of a written detailed notice is designed to prevent the unfair surprise inherent in springing an oral motion upon the prosecutor and the court on the eve of jury selection.").

Even if this Court were to accept petitioner's argument regarding cause for

failing to preserve his claim, no prejudice has been demonstrated by petitioner. Kotler makes the conclusory statement that "the ultimate over-representation of nurses on the jury panel was particularly prejudicial here where the testimony of a nurse became at issue during the trial." (Petition, at 35.) The Court finds this singular statement unsubstantiated and belied by the record. The testimony to which petitioner refers is that of a medical doctor and not a nurse. (Tr. 3078 - 3107.) In any event, any purported prejudice is purely speculative, particularly in light of the overwhelming evidence of petitioner's guilt in this case.

Nor has petitioner demonstrated that a fundamental miscarriage of justice would occur if these claims were not reviewed by the *habeas* court. To the extent petitioner argues that a miscarriage of justice will result if his claim is not reviewed because he is actually innocent of the crime for which he was convicted, the Court rejects that argument and finds that there was overwhelming evidence of guilt established by the prosecution, as discussed *supra*. Accordingly, petitioner's claim is procedurally barred from review by this Court. In any event, assuming *arguendo* that the constitutional right to a trial jury comprised of a fair cross-section of the community claim is reviewable based on cause for default and prejudice resulting therefrom, the claim is substantively without merit, as set forth *infra*.

B. Right to be Present

Petitioner claims that his right to be present during all material stages of trial was violated "numerous times when various notes were received by the court from the deliberating jury; when responses to these

notes were formulated; and when action upon them was taken." (Petition, at 9.) As set forth below, this claim has no merit.

## 1. Applicable Law

An accused enjoys a right both at common law and pursuant to the Sixth Amendment's Confrontation Clause to be present at all stages of trial. *Illinois v. Allen*, 397 U.S. 337, 338 (1970). The defendant's right to be present at trial is also implicated by the fair trial concerns of the Fifth and Fourteenth Amendments, as they require a criminal defendant's presence "'to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only.'" *Gagnon*, 470 U.S. at 526 (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 108 (1934), *overruled in part on other grounds by Malloy v. Hogan*, 378 U.S. 1 (1964), and citing *Faretta v. California*, 422 U.S. 806, 819-20 n.15 (1975)); *see also United States v. Jones*, 381 F.3d 114, 121 (2d Cir. 2004) (same), *cert. denied*, 543 U.S. 1072 (2005); *Polizzi v. United States*, 926 F.2d 1311, 1318 (2d Cir. 1991) (citations omitted). A defendant has the right "to be present in his own person whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987) (quoting *Snyder*, 291 U.S. at 105-06).

However, the right to be present is not absolute and the privilege of presence is not guaranteed "when presence would be useless, or the benefit but a shadow." *Id*. at 745 (quoting *Snyder*, 291 U.S. at 106-07); *see also Cohen v. Senkowski*, 290 F.3d 485, 489 (2d Cir. 2002). Moreover, while a more expansive right to be present may apply under New York law, that broader right is not applicable in a federal *habeas* proceeding

where it does not implicate the rights of the defendant under the United States Constitution. *See Rios v. Artuz*, No. 07 Civ. 330 (NGG), 2007 WL 1958899, at *9 n.4 (E.D.N.Y. June 29, 2007).

Also, "[a]lthough trial courts must vigorously safeguard a criminal defendant's right to be present, a defendant may expressly or effectively waive the right." *Senkowski*, 290 F.3d at 491 (quoting *United States v. Fontanez*, 878 F.2d 33, 36 (2d Cir. 1989)) (additional citations omitted). "A waiver of this guarantee, as the waiver of any constitutional right in a criminal proceeding, must be knowing and voluntary," and the trial court's factual findings "as to whether [petitioner] was knowingly and voluntarily absent will not be disturbed unless 'clearly erroneous.'" *Polizzi*, 926 F.2d at 1319 (citing *Sassower v. Sheriff of Westchester County*, 824 F.2d 184, 191 (2d Cir. 1987), *United States v. Tortora*, 464 F.2d 1202, 1208 (2d Cir. 1972), *Fontanez*, 878 F.2d at 36 (internal citations omitted), and Fed. R. Civ. P. 52(a) ("Findings of fact shall not be set aside unless clearly erroneous.")). In addition, "the defendant or his counsel must object at the time of the violation or the defendant's right to be present will be deemed waived." *Jones*, 381 F.3d at 122 (citing *Gagnon*, 470 U.S. at 529). Generally, violations of the right to be present during all critical stages of the proceeding are subject to harmless error analysis. *Yarborough v. Keane*, 101 F.3d 894, 898 (2d Cir. 1996).

## 2. Deadlock Jury Note

Petitioner claims that his right to be present was violated when the trial court unsealed and disclosed the contents of a note from the jury indicating that it was evenly deadlocked. (Petition, at 11.) As set forth

below, the Court disagrees. The record clearly demonstrates that (1) the deadlock note was disclosed to the parties; (2) the judge's proposed response to the note was discussed among the lawyers and the judge, in petitioner's presence, and petitioner was present when the judge's response was agreed upon; and (3) petitioner was present when the instruction was given to the jury. Although the note was also briefly discussed by the lawyers in chambers without petitioner's presence, petitioner consented to not being present for that discussion, the discussion was then summarized on the record, and (as noted above) petitioner was present for the discussion regarding the instruction that would be given and present for the instruction itself. Thus, his right to be present was not violated.

"It is settled law that messages from a jury should be disclosed to counsel and that counsel should be afforded an opportunity to be heard before the trial judge responds." *United States v. Ronder*, 649 F.2d 931, 934 (2d Cir. 1984) (internal citations omitted); *accord United States v. Rogers*, 422 U.S. 35, 39 (1975) ("[T]he jury's message should have been answered in open court and . . . petitioner's counsel should have been given an opportunity to be heard before the trial judge responded.").

The note at issue stated that the jury was deadlocked, with six to five and one undecided. (Tr. 4372.) The court initially sealed the note on the record, deciding that the numbers should not be divulged to the attorneys and defendant. (Tr. 4372.) Because the trial took almost six weeks and the jury at that time had only deliberated for about one full day, the trial court stated, "[b]ecause of the length of the trial I think there should be some further discussion without any

problems." (Tr. 4373.) When the court discussed this with counsel, in the presence of the petitioner, counsel for petitioner explicitly agreed that the jury should be directed to continue deliberating, but objected only to the extent that the full contents of the note (including the jury vote) was not being disclosed to counsel and petitioner. (Tr. 4374-81.) Following the court's instruction to the jury to continue its deliberations, counsel and the court discussed whether or not the contents of the note should be disclosed to the prosecution and defense under New York law. (Tr. 4382-84.) Counsel for petitioner stated on the record that petitioner consented to his lawyers having this discussion without him in the judge's chambers. (Tr. 4384.) Finally, on consent of the petitioner and counsel, the trial court disclosed the contents of the jury note to counsel, but not publicly. (Tr. 4391-92.)

This Court is not persuaded that petitioner's right to be present was violated in any way by the trial court's handling of this jury note. As the transcript clearly shows, the trial court discussed the note in open court with defendant and counsel present and outside the presence of the jury, in an effort to keep the sensitive material sealed if necessary. The trial court also considered carefully the input of petitioner's counsel and proceeded to allow counsel to research the issue of disclosure and have extended discussions on the issue in chambers. More importantly, there is nothing in the record to indicate anything on the part of petitioner but full awareness and consent to the instruction given to the jury to continue deliberations following the deadlock jury note, as well as consent to the court having discussions with counsel in chambers outside the petitioner's presence. Indeed, the following exchange took place on

the issue:

> THE COURT CLERK: The defendant and the attorneys are still in the courtroom.

> MR. LITMAN: I've spoken to my client and he's perfectly agreeable and consents to the lawyers alone going with you in the back room, if that's okay.

> THE COURT: It is okay with me.

> MR. LITMAN. Okay.

> . . .

> (Whereupon, the Court and counsel entered the judge's chambers.)

> THE COURT: Note that the defendant is not here. You agree?

> MR. LITMAN: Yes, we put that on the record, sir.

(Tr. 4384.) Right before the jury was brought out for the instruction, moreover, the court again discussed, in the presence of petitioner, the following with petitioner's counsel:

> MR. LITMAN: [o]ur request is that when the jury comes back, you say with respect to the note you previously sent, I ask you to continue to deliberate. If you continue to be deadlocked, please let us know, but you don't have to

> let us know the numbers anymore. That's my request.

> THE COURT: Fine. Yeah, because ordinarily the note that comes back is we're deadlocked, period. Right.

(Tr. 4400-01.) Thus, the Court finds that petitioner was in fact present for all material discussions regarding the jury note and waived any further presence in the trial court's chambers for discussion on the law. He further had opportunity to once again voice any objections with and through his counsel before the jury instruction was finally given. Thus, the Court denies petitioner *habeas* relief on this ground. *See, e.g., Edwards v. Fischer*, 414 F. Supp. 2d 342, 363 (S.D.N.Y. 2006) (petitioner's absence from judge's robing room when judge received deadlock jury note did not violate his due process right to be present because "[p]etitioner fails to demonstrate how his presence at the robing room conference would have benefitted his defense, or that his absence in the least bit compromised the fairness of his trial"); *cf. Pellington v. Greiner*, 307 F. Supp. 2d 601, 607 (S.D.N.Y. 2004) (judge's discussion with juror in presence of counsel and court reporter regarding conduct of another juror did not violate petitioner's constitutional right to be present); *Gillespie v. Miller*, No. 04 Civ. 0295 (LAP) (AJP), 2004 WL 1689735, at *17 (S.D.N.Y. July 29, 2004) ("Gillespie was present during trial through the jury charge and had the opportunity to contribute and consult with his attorney, and was only absent when his attorney made an additional objection to the jury instructions to place it on the record for later appeal. Thus, Gillespie was not absent during a 'material' stage of his trial.") (citations

omitted).

## 2. List of Items in Evidence

Petitioner next claims that in response to a jury note requesting a list of items in evidence, the court and counsel, in his absence and without his knowledge, "formulated a two prong response," which "resulted in all the trial exhibits being immediately sent into the jury room" and "the court directing the court clerk to prepare an 'exhibit list' that was subsequently furnished to jurors." (Petition, at 11-12.) As set forth below, petitioner's claim is meritless, and there is no basis to conclude that a constitutional violation occurred.

First, the record does support petitioner's assertion that the initial response to the jury note was discussed outside his presence, but in the presence of counsel. (Tr. 4393.) The trial court, with input and consent of counsel, initially responded to the jury's request for a list of items in evidence by furnishing all of the trial exhibits not yet provided. (Tr. 4394-97.) Counsel for petitioner stated that he would speak to his client regarding his consent to an exhibit list:

> MR. HINRICHS: I would like everything, including the photographs, to go in and we can work the details of the list, Your Honor.
>
> THE COURT: Okay, fine; you're both essentially agreeing to that.
>
> MR. HINRICHS: Right, and we'll work out the details of the list together.

> MR. LITMAN: Let me check with him, but I think he's in agreement with that.
>
> THE COURT: Oh, come on.
>
> MR. LITMAN: Judge, it's his trial, not mine.
>
> THE COURT: I know it's his trial, but you're so experienced, Jack.
>
> MR. LITMAN: I know, but it is his trial.
>
> THE COURT: It's his trial. Go talk to him.

(Tr. 4397.) Then, the following took place in the courtroom, in the presence of counsel and the defendant:

> THE COURT: With your consent, gentlemen, I – we already sent, with your consent, the – all the items of evidence in, since you were both – when I say both, the defense and the prosecution, going over a list to furnish the jury, but we did send all items of evidence in to see if they could pick them from that.
>
> MR. LITMAN: Right, and we're going to be in the process of preparing a list of the exhibits to go in.
>
> THE COURT: And when you consent to a list, we'll send that list in.

MR. LITMAN: And I appreciate you just mentioning to the jury that we're in the process of making it.

THE COURT: I will. I will.

(Tr. 4398-99.) When the jury was reassembled, however, the jury foreperson stated that the jury did not want to see all of the exhibits. (Tr. 4404.) The trial court then stated that a list describing each item would be made and sent to the jury so they could discern which exhibits they wanted in writing. (Tr. 4404.)

It is clear from the record that petitioner was consulted by his counsel prior to his counsel confirming his consent for the record on the issue of this exhibit list. It is also clear that petitioner was present in court when the exhibit list was further discussed by the court and the parties, and petitioner's counsel specifically made requests regarding the details of the list. Moreover, these discussions about the list took place over two days, July 17 and July 18, 1997, until the list was completed. Indeed, the next morning the court informed petitioner and counsel that the list had been prepared by the court clerk and needed to be reviewed and initialed by counsel. (Tr. 4409.) At no time during this entire two-day period did petitioner or his counsel object to the creation of an exhibit list for the jury. Therefore, petitioner was not denied his right to be present with respect to the jury's request for an exhibit list or the creation of that exhibit list.

Petitioner further argues that "after 'all' the unrequested trial exhibits were provided, a portion of this evidence was arbitrarily removed from the deliberative process"

without petitioner's knowledge. (Petition, at 12.) Specifically, the record contains a post-trial affidavit from one of petitioner's trial attorneys stating the following:

> During jury deliberations in the trial of the above-captioned matter, at our request, we together with the prosecuting attorneys, were provided by court personnel with certain exhibits and an exhibit list, both of which had been retrieved from the jury as they deliberated. I sat down with the prosecuting attorneys, Randall-Hinrichs and Thomas Costello, and examined these exhibits for the purpose of specifying, with greater particularity, their description on the index of all the exhibits. These items of evidence were later returned to the jury, along with the newly drafted index, as the jury continued to deliberate.

(Appellate Court Appendix ("A."). 83.) This occurrence is not reflected in the trial transcript and it is unclear from the affidavit how long the exhibits were removed from the jury room to assist in the preparation of the exhibit list. Petitioner claims that he was unaware that this action had occurred. (Petition, at 15.) The Court concludes, however, that any temporary removal of trial exhibits from the jury room in connection with the preparation of the exhibit list did not violate petitioner's constitutional rights in any way. Based upon his counsel's affidavit, it is clear that the exhibits were returned to the jury room, and there is no indication that

the jury at any point was denied access to an exhibit that they wished to review. In fact, when the jury requested a list of items in evidence, and the court sent them all the evidence while the list was being prepared, the jury foreperson told the court, "[w]e didn't want you to bring them all in." (Tr. 4404.) Thus, there is no basis for concluding that any temporary removal of the exhibits from the jury room to allow the exhibit list to be prepared prejudiced the petitioner in any way, or that his purported lack of knowledge as to that fact violated his constitutional rights.

In short, although the court initially discussed the note regarding the exhibit list with counsel on the record in chambers, petitioner was present in court when the note was subsequently discussed, and it was agreed that an exhibit list would be prepared by the lawyers for submission to the jury. Thus, the record is abundantly clear that petitioner knew of the note, was present when it was discussed in court, and knew his lawyer was involved in preparing an exhibit list for submission to the jury. Therefore, there is no basis for any claim of violation of his constitutional right to be present in connection with that note.

In sum, the Court rejects petitioner's claim that the trial's court handling of jury notes violated his constitutional right to be present. He has failed to show any absence that had any "relation, reasonably substantial, to the fulness of his opportunity to defend against the charge," *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987), and there is no basis to conclude that the state court's decision on these issues was contrary to, or an unreasonable application of, federal law.

C. Right to Judicial Oversight: 911 Tape

In the instant case, petitioner also claims that the court clerk, "upon her own initiative, and without the authority and knowledge of the presiding justice, furnished the deliberating jury with a 911 tape of the complainant's initial call to police." (Petition, at 10.) However, as set forth below, there is no evidence that the jury was ever given the 911 tape (or ever listened to it during deliberations) and, in any event, petitioner has not demonstrated any prejudice, even assuming *arguendo* that the jury did receive it.

The record indicates that on July 16, 1997, a note from the jury was discussed with counsel and the petitioner. (Tr. 4350-51.) The note requested several items, two of which were crossed off; the first was a statement of a witness, Laurel Edwards, and the second was a 911 tape of the victim reporting the crime to the police. (Tr. 4350.) The record shows that upon receiving this note, the trial judge disclosed its contents in open court, outside the jury's presence, and noted the two items that were crossed off. (Tr. 4350-51.) The affidavit of Laurel Edwards had been directed by the trial court to be disclosed in response to a previous note, which had mistakenly requested the deposition of a Laurel Andrews. (Tr. 4346-47.) Also in response to an earlier jury note, the trial court made clear that there was no tape of the dispatcher, even though the dispatcher had testified at trial. (Tr. 4347.) The court also stated in the presence of counsel that the 911 tape and a tape of the dispatcher were distinct. (Tr. 4342.)

Petitioner claims that the 911 tape nonetheless was given to the jury, against the direction of the court. However, the record does not support this contention. The following dialogue took place between the trial court judge and clerk on the issue of the

tape:

> THE COURT: 7-16 – the new note is 7-16-97, 2:30 p.m. They themselves put the time on. "Please give us" – and I'm going to read one and two, even though one and two are crossed out, so I don't know whether one and two are crossed out forever or crossed out to show me that they don't want what's on the first note, I'll have to ask them that. Number one, crossed out, is 911 tape. That's crossed out. That was not on the first note. Number two, Laurel Edwards'

disposition affidavit, and that is crossed out, so I'm going to ask them whether they want that because they, in the first note –

> THE COURT CLERK: Judge, they've already been provided with that, pursuant to your direction.

> THE COURT: What is that?

> THE COURT CLERK: Pursuant to your direction they were already provided –

> THE COURT: They were already provided – when, when they went back in now?

> THE COURT CLERK: Yes.

(Tr. 4350-51.) As the court clerk's statement that what was provided was done so "pursuant to [the trial judge's] direction," it is clear that this statement applied to the Laurel Edwards affidavit, which the court had directed be provided to the jury, and not the 911 tape, as petitioner contends. Moreover, there is nothing in the record to reflect that the jury was ever furnished with a tape recorder to play any tape in the jury room. Thus, there is no indication that the jury was in fact furnished with the 911 tape and no support for petitioner's position. *See Gaines v. Kelly*, 202 F.3d 598, 601 (2d Cir. 2000); *see also Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (federal courts may not "grant[] habeas relief on the basis of little more than speculation with slight support").

In sum, the record reflects that the trial court gave proper attention to the jury's requests and did not direct the submission of the 911 tape, and petitioner has failed to establish that the tape was indeed given to the jury. Moreover, even assuming *arguendo* that it was given to the jury, there was no prejudice to the defendant because, as noted *supra*, the court sent all the other trial exhibits back to the jury room during the deliberations (while the exhibit list was being prepared). Under these circumstances, there is no reason to believe that defendant's constitutional rights were violated. Specifically, there is no evidence that there was a lack of judicial oversight, intentional or inadvertent, that undermined the fundamental integrity of petitioner's criminal trial. *Cf. United States v. Grant*, 52 F.3d 448, 451 (2d. Cir. 1995) (holding that judge's absence during readback of testimony in the courtroom did not violate defendant's right to a proper jury trial); *Christian v. Artus*, No. 04 Civ. 10174 (MHD), 2006 WL 2463432, at *9 (S.D.N.Y. Aug. 23, 2006) ("The Appellate Division properly determined that no judicial authority had been delegated by the trial judge in this case because the court remained available at all times to make any necessary inquiries . . . . There was no danger of

anyone but the judge exercising the court's adjudicatory power[.]").

## D. Access to Counsel

Petitioner further alleges that "[t]he trial judge placed totally unnecessary restrictions upon the petitioner's ability to confer with counsel by repeatedly admonishing the petitioner when he attempted to confer with his attorney during the trial." (Petition, at 15.) Respondent's position is that this argument is unexhausted and was not previously raised in the state court proceedings. The Court agrees that the claim is unexhausted and can no longer be presented in state court, and no showing of "cause or prejudice" or actual innocence has been made. In any event, the Court also finds the claim frivolous on the merits.

Pursuant to 28 U.S.C. § 2254(b)(1)(A), a federal *habeas* petition must be dismissed if the petitioner has failed to exhaust all state judicial remedies. 28 U.S.C. § 2254(b)(1)(A) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State."). "This exhaustion requirement is also grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of [a] state prisoner's federal rights." *Coleman*, 501 U.S. at 731; *see Rhines v. Weber*, 544 U.S. 269, 276 (2005) ("This [statutory] scheme reinforces the importance of [the] 'simple and clear instruction to potential litigants [enunciated in *Rose v. Lundy*, 455 U.S. 509, 520 (1982)]: before you bring any claims to federal court, be sure that you first have taken each one to state court.'"); *Jones v. Keane*, 329 F.3d 290, 294 (2d Cir. 2003) ("By requiring exhaustion, federal courts recognize that state courts, 'no less than federal courts, are bound to safeguard the federal rights of state criminal defendants.' ") (quoting *Daye v. Attorney Gen. of New York*, 696 F.2d 186, 191 (2d Cir. 1982) (en banc)). Therefore, pursuant to the exhaustion requirement, a petitioner must provide the state courts with an opportunity to consider fully each of his *habeas* claims; that is, "state review ends when the state courts have finally resolved an application for state postconviction relief." *Roper v. Weaver*, 550 U.S. 598, 601 (2007) (quoting *Lawrence v. Florida*, 549 U.S. 327, 332 (2007)); *see Jones*, 329 F.3d at 294-95 ("Exhaustion requires a petitioner fairly to present the federal claim in state court.") (citing *Strogov v. Attorney Gen. of New York*, 191 F.3d 188, 191 (2d Cir. 1999)).

Nonetheless, if a *habeas* petitioner could no longer raise unexhausted federal claims in state court under state procedural rules, a federal court could deem his claims exhausted for purposes of *habeas* review. 28 U.S.C.A. § 2254; *see also Clark v. Perez*, 510 F.3d 382, 390 (2d Cir. 2008) ("When a 'petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred,' the federal habeas court should consider the claim to be procedurally defaulted") (quoting *Coleman,* 501 U.S. at 735 n.1 (1991)); *Acosta v. Giambruno*, 326 F. Supp. 2d 513, 522 (S.D.N.Y. 2004) ("[Petitioner] cannot again seek leave to appeal these claims in the [New York] Court of Appeals because he has already made the one request for leave to appeal to which he is entitled. Accordingly, the Court may deem his claim exhausted.

Nevertheless, as discussed below, [petitioner's] inability to return to state court also provides an independent and adequate state ground upon which his claims are procedurally defaulted.") (internal quotations and citations omitted).

In this case, petitioner has failed to exhaust his claim regarding communication with counsel. The state appellate court never had the opportunity to review petitioner's claim – a necessary precedent to review of petitioner's federal *habeas* petition. However, petitioner has also procedurally defaulted on his claim because New York's procedural rules now bar him from raising them in the state courts. Because petitioner was required to raise his constitutional objections during trial, his claim was unpreserved for appellate review. *See Jones*, 381 F.3d at 122. "Further direct review by the Court of Appeals is no longer available, and the failure to have raised this claim on direct review now forecloses further collateral review in state court." *Solomon v. Greene*, No. 05 Civ. 10894 (RJS), 2008 WL 2018207, at *5 (S.D.N.Y. May 7, 2008) (internal citations omitted). "In the case of procedural default (including where an unexhausted claim no longer can proceed in state court), [the Court] may reach the merits of the claim 'only if the defendant can first demonstrate either cause and actual prejudice, or that he is actually innocent.'" *St. Helen v. Senkowski*, 374 F.3d 181, 184 (2d Cir. 2004) (quoting *Bousley v. United States*, 523 U.S. 614, 622 (1998) (internal quotation marks and citations omitted)). In the instant case, petitioner fails to meet this standard and has failed to even present arguments regarding "cause and actual prejudice." *Id*. Petitioner makes unsubstantiated assertions that the trial court impeded his ability to consult with his attorney that are in fact belied by the record, as discussed *infra*, and no explanation has been provided as to why this claim is brought for the first time in this Court.

Moreover, even assuming *arguendo* that petitioner had properly presented his claim regarding access to counsel, the Court finds, for the following reasons, that this claim lacks merit. Certain limited restrictions can be placed on the right of a criminal defendant to consult with his counsel during a trial. *Compare Geders v. United States*, 425 U.S. 80, 91 (1976) (holding order not to speak with counsel overnight while he was testifying was unconstitutional) *with Perry v. Leeke*, 488 U.S. 272, 283-84 (1989) (holding that order directing defendant not to consult with attorney during a fifteen minute recess at the end of direct examination of defendant was constitutional); *see generally Serrano v. Fischer*, 412 F.3d 292, 297-302 (2005) (discussing applicable law). Here, no restrictions of any kind were placed on petitioner's ability to confer with counsel and participate fully in his defense.

Petitioner points to several portions of the trial transcript as illustrations of the court's admonishments of petitioner's attempts to confer with his attorney. (Petition, at 15 (citing Tr. 204, 774A, 1478, 1489, 1951, 3645-46, and 3686).) An examination of these excerpts, however, shows that the court admonished petitioner for failing to listen to the trial judge when he was speaking or for otherwise failing to follow proper courtroom protocol, such as speaking within earshot of prospective jurors, and that these were the sole grounds for the admonitions. For example, the following exchange occurred at one point during the trial:

> THE COURT: With respect to – are you listening to me? It's been five weeks and

you've been doing nothing when I speak but talk to your client or your client talking to you.

> MR. LITMAN: Judge, we heard literally everything you said.

> THE COURT: There's no sense the defendant being in the courtroom; he's not listening, yet he runs up to the bench every time you come up here. He doesn't listen to me when I'm sitting up here, yet he wants to run up here to appear to be one of the listeners.

> MR. LITMAN: Your Honor, we were listening. Please forgive me.

> THE COURT: You weren't listening; you were talking to him. I'm sitting up here approximately two feet higher than you are. I saw him leaning in front of Mr. Sosinsky and you were leaning over talking to him right in the middle of my speech. I just don't like to be interrupted. I'm still a judge up here.

(Tr. 3645-46.) On another occasion, the trial court stated, "One further thing. Can I have your attention, please? I'm telling you now, Kotler, when I talk, you stop talking; you understand that?" (Tr. 1478.) Thus, the trial court did not prohibit petitioner from speaking with his attorney, but rather was simply admonishing him as to the manner in which those communications were occurring. In other words, these admonishments were a proper attempt to keep decorum and order in the courtroom, and there is no basis in the record to conclude that petitioner was hindered in his ability to confer with counsel or to participate in his defense in any way. *See, e.g.*, *Perry v. Leeke*, 832 F.2d 837 (4th Cir. 1987) ("Not every limitation of the relationship between a defendant and his attorney violates the defendant's right to counsel, however. A trial court is not required, for example, to interrupt trial proceedings whenever a defendant and his attorney express a desire to confer."). To the contrary, the record reflects full and complete participation by the defendant in his counsel's defense of the trial.

The situation here is similar to the circumstances in *Byrd v. Walker*, No. 98 Civ. 55 (JGK), 2000 WL 565193, at *5 (S.D.N.Y. May 9, 2000), where the state trial court ordered that counsel and defendant not confer during the charge to the jury. In holding that such an order did not violate petitioner's Sixth Amendment rights, the court explained:

> That instruction was given after the trial court began to charge the jury; the record does not reflect how loudly the defendant and his counsel were talking to prompt the judge's instruction. In any event, the petitioner and his counsel were plainly free to pass notes, and to consult orally after the charge was over. They did not, however, have the right to distract the jury and disturb the proceeding by talking during the charge. The court's order did not violate the

petitioner's Sixth Amendment rights. The ban was of limited duration, it applied to oral, not written, communication, and it was consistent with norms of decorum and order to be expected during the reading of the final charge to the jury.

*Id.*; *see also Serrano*, 412 F.3d at 301 ("With regard to the first of the orders directing counsel not to confer with his client, the bar on communications was only momentary; *immediately* after chastising the defense attorney and conferring with counsel for both parties regarding the propriety of defense counsel's actions, the judge brought the jury back into the courtroom and directed that the testimony continue.").

Similarly, in the instant case, having reviewed the record, this Court does not agree with petitioner that the court made "highly improper" admonishments in an attempt to restrict petitioner's ability to consult with his attorney. On the contrary, petitioner was afforded tremendous opportunity to consult with his counsel throughout his six-week trial, as reflected by the entire record. Petitioner himself observes, "[a]s the prosecution conceded in the state court appeal, this petitioner was unusually active in guiding his own trial strategies." (Petition, at 18.).

More importantly, there is simply no evidence that any of these admonishments "exacerbate[d] the prejudice when petitioner's right to presence was violated," considering that petitioner has failed to show that any right to be present was actually violated or that any prejudice may have independently resulted from the court's admonishments. Every instance that petitioner cites as an admonishment by the court took place outside the presence of the jury, thereby precluding any influence on its deliberations.

In sum, because the Court finds that the record reflects that petitioner had more than sufficient opportunity to make verbal or written exchanges with his counsel inside and outside the courtroom over the entire trial, petitioner's claim fails on its merits.

E. Evidentiary Rulings: Hearsay

It is well-settled that "[e]rroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus." *Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir. 1983); *see generally Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("[H]abeas corpus relief does not lie for errors of state law.") (citations omitted). Instead, for a *habeas* petitioner to prevail in connection with a claim regarding an evidentiary error, the petitioner must "show that the error deprived [him] of a fundamentally fair trial." *Taylor*, 708 F.2d at 891; *see also Zarvela v. Artuz*, 364 F.3d 415, 418 (2d Cir. 2004) ("Even erroneous evidentiary rulings warrant a writ of habeas corpus only where the petitioner 'can show that the error deprived [him] of a fundamentally fair trial.'") (quoting *Rosario v. Kuhlman*, 839 F.2d 918, 925 (2d Cir. 1988) (internal quotation marks omitted)). In other words, "[t]he introduction of improper evidence against a defendant does not amount to a violation of due process unless the evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice.'" *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998) (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990) (internal quotation marks omitted)).

To constitute a denial of due process

under this standard, the erroneously admitted evidence must have been "'sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.'" *Dunnigan*, 137 F.3d at 125 (quoting *Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir. 1992) (internal quotation marks omitted)); *see also Collins v. Scully*, 755 F.2d 16, 19 (2d Cir. 1985) (holding that evidence must be "crucial, critical, highly significant") (internal quotation marks omitted). Moreover, the court "must review the erroneously admitted evidence 'in light of the entire record before the jury.'" *Dunnigan*, 137 F.3d at 125 (quoting *Johnson v. Ross*, 955 F.2d at 181 (internal quotation marks omitted)). In making this due process determination, the Court should engage in a two-part analysis, examining (1) whether the trial court's evidentiary ruling was erroneous under New York State law, and (2) whether the error amounted to the denial of the constitutional right to a fundamentally fair trial. *Wade v. Mantello*, 333 F.3d 51, 59 n. 7 (2d Cir. 2003); *Davis v. Strack*, 270 F.3d 111, 123-24 (2d Cir. 2001). As set forth below, the Court has reviewed Kotler's objections regarding hearsay under this two-part test and concludes that it does not warrant *habeas* relief.

Petitioner asks for *habeas* relief on the basis of the trial court's admission of certain hearsay testimony. In particular, he argues that certain testimony of Lieutenant Thomas O'Heir was hearsay, and that the out-of-court statements of Trina Lyons and Thomas Herr were hearsay and violative of his right of confrontation. (Petition, at 21-22.) O'Heir testified that a barbecue at petitioner's home took place on August 12, 1995 and that Lyons and Herr attended this event, although petitioner argues that O'Heir had no personal knowledge of this barbeque. (Petition, at 22.) Written statements from Lyons and Herr

stated that they attended this barbeque and that petitioner and the Grand-Am vehicle were absent. (Petition, at 22.) Neither Lyons nor Herr testified at the trial, however.

"Courts may not admit testimonial out-of-court statements which are made by an individual who does not testify at trial and whom defendant has not had an opportunity to cross-examine, if the statements are offered for the truth of the matter asserted." *People v. McEaddy*, 41 A.D. 3d 877, 878 (N.Y. App. Div. 2007) (internal citations omitted). Respondent does not argue that the out-of-court statements by Trina Lyons and Thomas Herr, and the aforementioned testimony of Thomas O'Heir, fell within a hearsay exception. The Court will assume, therefore, for the purposes of this claim that such statements did in fact constitute inadmissible hearsay. Nevertheless, turning to the second prong of the test set forth by the Second Circuit, the Court finds that, even assuming *arguendo* that the introduction of these statements violated New York State law, such error did not, in light of the entire record, deprive petitioner of his constitutional right to a fundamentally fair trial.

As noted *supra*, the evidence of Kotler's guilt in this case was overwhelming, including the DNA evidence establishing the defendant's semen on the victim's skirt and on vaginal swabs taken from the victim. As petitioner concedes, he testified that "on the night of the alleged crime his girlfriend's Pontiac Grand-Am was parked 'on the driveway' of his East End Long Island home." (Petition, at 21.) The transcript also reveals that the trial court admitted the affidavit of Laurel Edwards, a neighbor of the petitioner, who stated that she saw the Grand Am in Montauk throughout the

weekend of August 11 and 12, 1995. (A. 110.) Thus, the jury did also hear testimony regarding the whereabouts of the Grand Am that supported the defense's theory. In light of the overwhelming evidence of petitioner's guilt, and the rejection by the jury of the defense's theory that the police framed the petitioner by planting his semen on the evidence, this Court is unpersuaded that the verdict would have been any different had the hearsay testimony been properly excluded at trial. The Court's review of the trial transcript, including the overwhelming evidence of petitioner's guilt, demonstrates that the claimed errors were not "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Dunnigan*, 137 F.3d at 125. Accordingly, the Court finds *habeas* relief unwarranted on these grounds where there is no basis to conclude that the state court's decision, which also denied petitioner relief on this claim, was contrary to, or an unreasonable application of, federal law.

### F. Confrontation Clause

To the extent that petitioner claims that the admissions into evidence of the above-referenced hearsay testimony and out-of-court statements violated his rights under the Confrontation Clause, the Court also rejects petitioner's claim.

"The Confrontation Clause of the Sixth Amendment, which applies to the states through the Fourteenth Amendment, guarantees the defendant in a criminal prosecution the right to confront the witnesses against him." *Henry v. Speckard*, 22 F.3d 1209, 1214 (2d Cir. 1994) (citation omitted). Thus, the Confrontation Clause prohibits the prosecution from introducing "testimonial" statements by a non-testifying declarant unless the declarant is unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant. *United States v. Crawford*, 541 U.S. 53, 53-54 (2004); *see also Davis v. Washington*, 547 U.S. 813, 821 ("It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause."). The Supreme Court has made clear that there is "an absolute bar to statements that are testimonial, absent a prior opportunity to cross-examine," *id.* at 61, and "[w]here testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Id.* at 68. *Crawford*, however, declined "to spell out a comprehensive definition of 'testimonial,'" stating that, "[w]hatever else [the term] covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.*

It is clear in this case that the hearsay statements at issue should be considered "testimonial" for the purposes of the Sixth Amendment. *See, e.g.*, *United States v. Savoca*, 335 F.Supp. 2d 385, 391 (S.D.N.Y. 2004); *see also Liner v. Artus*, No. 08 Civ. 5886 (GEL), 2008 WL 5114485, at *3 (S.D.N.Y. Dec. 5, 2008) ("While the [*Crawford*] Court did not comprehensively define this category, it did note that the phrase encompasses a 'core class' of statements such as ex parte testimony, affidavits, statements in response to police interrogation or similar statements 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a

later trial.'").

However, "[a] violation of a defendant's confrontation rights does not, standing alone, require reversal of a judgment of conviction. Rather, [a] violation[ ] of the Confrontation Clause [is] subject to harmless error analysis." *Bodenburg v. Conway*, No. 05 Civ. 01119 (ADS), 2007 WL 2295812, at *11 (E.D.N.Y. Aug. 4, 2007) (internal citations omitted) (alterations in original); *accord United States v. McClain*, 377 F.3d 219, 222 (2d Cir. 2004) ("It is well established that violations of the Confrontation Clause, if preserved for appellate review, are subject to harmless error review, . . . and *Crawford* does not suggest otherwise."); *United States v. Hundley*, No. 02 Cr. 441 (LAP), 2004 WL 2414038, at *8 (S.D.N.Y. Oct. 28, 2004) (ruling that under *McClain*, "[a]dmission of evidence in violation of the confrontation clause is not a structural error automatically requiring a new trial but rather is subject to harmless error review"); *Kello*, 96 N.Y. 2d at 743 ("Were this claim of constitutional error properly before us and we agreed, our task would be to determine whether introduction of the tapes was harmless error beyond a reasonable doubt.").

In this case, as discussed *supra*, evidence of petitioner's guilt was so overwhelming so as to render the admission of these statements as to petitioner's absence during the alleged barbeque at his home harmless error. Accordingly, the Court finds that, regardless of whether or not the statements at issue constituted testimonial hearsay, their introduction nonetheless resulted in harmless error. There is absolutely no basis to conclude that the alleged error "had substantial and injurious effect or influence in determining the jury's verdict" and that it actually prejudiced petitioner. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)

(quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).[2]  Thus, *habeas* relief is denied on these grounds.

---

[2]  The Supreme Court stated in *Fry v. Pliler*, 551 U.S. 112, 127 S. Ct. 2321 (2007):

> We hold that in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the "substantial and injurious effect" standard set forth in [*Brecht*, 507 U.S. 619], whether or not the state appellate court recognized the error and reviewed it for harmlessness under the "harmless beyond a reasonable doubt" standard set forth in [*Chapman v. California*, 386 U.S. 18 (1967)].

*Id.* at 2328.  It may be an open question, however, whether the *Brecht* standard applies when there is no constitutional error found in the first place. *See, e.g.*, *Rice v. Senkowski*, No. 9:04 Civ. 335 (LEK) (DEP), 2007 WL 2789504, at *7 (N.D.N.Y. Sept. 24, 2007) ("It should be noted that the majority in *Fry* assumed, without deciding, that the trial court had committed constitutional error in excluding the testimony of a defense witness at the petitioner's trial, accepting the habeas court's finding in that regard.  Accordingly, whether the holding in *Fry*, and therefore use of the *Brecht* standard, is applicable in cases where no error of constitutional proportion is found to have been committed by the trial court remains to be determined.").  Here, however, the Court assumes for purposes of this analysis that the inadmissible hearsay did violate petitioner's rights under the Confrontation Clause.

### G. *Rosario* Violations

Petitioner alleges that his due process rights were violated by the "destruction" of certain *Rosario*[3] materials which could not be produced by the People. For the purposes of federal *habeas corpus* review, a *habeas* petition can only be granted to remedy some violation of *federal* law. Because the obligation to turn over *Rosario* material arises under state law, to the extent that this claim is based on a *Rosario* violation, it must fail. Thus, the only question is whether the prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. *See King v. Greiner*, No. 02 Civ. 5810 (DLC) (AJP), 2008 U.S. Dist. LEXIS 74493, at *133 n.41 (S.D.N.Y. Sept. 26, 2008).

Petitioner has failed to show how the People violated their obligations under *Brady*. Under *Brady*, the "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. "Such evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). Failure to disclose such material "merits relief only if the prosecution's failure 'undermines confidence in the outcome of the trial.'" *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *Bagley*, 473 U.S. at 678). In order to demonstrate a *Brady* violation, "a defendant must show that: (1) the Government, either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice." *United States v. Coppa*, 267 F.3d 132, 140 (2d Cir. 2001) (citing *Strickler*, 527 U.S. at 281-82).

In this case, petitioner is unable to establish that the evidence made unavailable as a result of the People's failure to preserve it would have altered the outcome of the proceeding. The first piece of evidence which was not produced was the scratch note that Police Officer David Cherkes used to take down the partial license plate given by the victim. Officer Cherkes transmitted the partial license plate over the radio about a minute after he wrote it down on the scratch paper. (Tr. 2199). Therefore, petitioner's argument that the existence of the scratch note would be material and would have altered the outcome of the proceeding lacks persuasive force. The same is true of petitioner's assertion that the tapes containing the reports of Detective Robert Titolo would have changed the outcome of the proceeding. Detective Titolo testified that in preparing his reports, he first dictated the reports into a Dictaphone machine, which was then placed onto audio cassette tapes that the secretaries would use to type the reports. (Tr. 2568). Not only has petitioner not shown that such material would have altered the outcome of the trial, he has also failed to show that this evidence would have been favorable to the defendant. Although it is true that the tapes may have contained statements that contradicted Titolo's trial testimony, it is also possible that they did not, or that they contained other statements that would have corroborated or strengthened the prosecution's case. Moreover, the trial court's strong adverse inference charge to the jury regarding the destruction of these tapes – including the instruction that "the People

---

[3] *People v. Rosario*, 9 N.Y.2d 286 (1961).

had a duty to preserve such tapes and make them available to the defendant for his use at trial" and that defendant could have impeached the witness' testimony with the contents of those tape recordings – also makes it extremely unlikely that the outcome of the proceeding would have been different or that the "confidence in the outcome of the trial" was seriously undermined. *Bagley*, 473 U.S. at 678. The Court cannot conclude, therefore, that petitioner has met the high standard that *Brady* requires.

Furthermore, even assuming *arguendo* that this Court could grant federal *habeas* relief based on *Rosario* violations, petitioner's claim is without merit. In New York cases where "*Rosario* material" is (1) lost or destroyed and cannot be produced, (2) the People failed to exercise care to preserve the material, and (3) the "defendant is *prejudiced* by their mistake, the court must impose an appropriate sanction." *People v. Martinez*, 71 N.Y.2d 937, 940 (1988). The trial court determined that it was necessary to impose a sanction against the People for failing to preserve the material in the form of the adverse inference charges given to the jury. "The choice of appropriate action is committed to the sound discretion of the trial court." *People v. Kelley*, 62 N.Y.2d 516, 520-21 (1984). The trial court in this case determined that the two adverse inference charges given were "appropriate remedies" for the purpose of curing any prejudice that resulted from the People's failure to preserve the *Rosario* material. *Whitfield v. Ricks*, No. 01 Civ. 11398 (LAK), 2006 WL 3030883, at *19 (S.D.N.Y. Oct. 24, 2006). Petitioner's concern regarding the potential exculpatory nature of the taped reports was remedied by the strong language of the adverse inference

charge issued by the trial court.[4]

[4] The trial court issued the following adverse inference regarding the scratch note:

> The law requires each side to furnish the other side with any written material or recordings made by persons that testify here that they've written or recorded, and this is supposed to be given before their testimony.
>
> You just heard about a note that the officer took at the scene where he first met the victim containing, as he testified, he indicated, a partial license plate.
>
> It is for you to decide. The evidence in this case showed that Officer Cherkes used this note on a piece of paper in making his radio call. The note, had it been produced, could possibly be of material help and assistance to you, the jury, in deciding that issue.
>
> You may not, under the law as I've indicated earlier to you, speculate or guess as to what the note contained; however, from the failure of the People to produce the note either to the other side - not either, to the other side, the testimony was that the note was lost or was left in the car or something to that effect. The law permits, but does not require you to infer that if the note had been produced by the People, such evidence would not support or would even contradict the testimony of the People's witness on that issue.

(Tr. 2226-27). The trial court issued the

following adverse inference regarding Detective Titolo's reports:

> Ladies and gentlemen, with respect to one witness, I gave you an adverse inference charge, it was a short inference charge. I'm going to give you another adverse inference charge which is quite a bit longer than the one I gave you, so I'd like you to be attentive. I realize the hour is late.

> I advise you that the defense, as a matter of law, is entitled to receive all prior statements made by witnesses whom the People call to testify, whether such statements be in writing, recorded statements, on tapes or anything like that.

> In this case you heard testimony from Detective Robert Titolo that tapes or recorded tapes made or tapes upon which there were recordings made by him for transcription into police reports relating to this case were destroyed by reuse.

> I charge you that the People had a duty to preserve such tapes and make them available to the defendant for his use at trial.

> Had the tapes been given to the defense or the defendant, he would have been permitted to point out and confront the witness with prior inconsistent statements or contradictions if the witness' testimony was different from the contents of the tape-recordings.

Because the determination of appropriate sanctions for the failure to produce *Rosario* materials is left to the discretion of the trial court, *Kelley*, 62 N.Y.2d at 520-21, petitoner's argument that his right to a fair trial was violated when the trial court gave an adverse inference charge for both the loss of the paper which possessed the partial license plate number given to Police Officer David Cherkes, and the re-use of the dictation tapes containing the reports of Detective Robert Titolo, thus fails even under the standard set forth by *Rosario*. The adverse inference charges issued to the jury constituted "appropriate sanctions" for the loss of the *Rosario* material. This Court agrees with the Appellate Division, which held that "[t]he trial court providently exercised its discretion

> Obviously, therefore, the defendant – the defendant in this case has no way of ascertaining whether the tape-recordings did or did not differ from the trial testimony of Detective Titolo. The defendant's right to fully and effectively cross-examine Detective Titolo has been restricted.

> Thereby, I instruct you that as a result of the People's failure to preserve this evidence, you may, but are not required to, draw an adverse inference against them; that is, infer that the tapes so destroyed would not support or would contradict or may have revealed inconsistencies with the police reports and/or Officer Titolo's testimony.

(Tr. 2827-29).

in only giving an adverse inference charge with respect to the People's destruction fo certain *Rosario* material and loss of other *Rosario* material. The form of the charge given was proper as well." *Kotler*, 31 A.D.3d at 788.

In sum, having carefully reviewed the record, the Court concludes that petitioner has failed to demonstrate that his constitutional rights were violated by the People's failure to preserve certain discovery materials. Accordingly, this claim does not provide a basis for *habeas* relief.

## H. Jury Composition

As discussed *supra*, the Court concludes that petitioner's claim regarding jury composition is procedurally barred. Nonetheless, in an abundance of caution, the Court will review the merits of petitioner's claim. The Court concludes that petitioner has failed to establish a *prima facie* violation of his right to a jury representing a fair cross-section of the community, as protected by the Sixth and Fourteenth Amendments.[5]

Petitioner argues that the "over-representation" of a specific occupational group – namely, nurses – constitutes a violation of his constitutional right to a jury representing a fair cross-section of the community. (Petition, at 35.) To establish a

constitutional violation on this basis, petitioner must show: "(1) that the group to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to systematic exclusion of the group in the jury selection process." *Duren v. Missouri*, 439 U.S. 357, 364 (1979).

First, for petitioner to succeed on his claim that there was an over-representation of nurses in the jury pool, he must establish that nurses are considered a distinct and cognizable class. Whether a class of persons is sufficiently distinct and cognizable is a question of fact. *Hernandez v. Texas*, 347 U.S. 475 (1954). To show that a group is distinct or cognizable, petitioner must show that: (1) the group can be adequately defined and limited by some factor (*i.e.,* that the group has a definite composition such as by race or sex); (2) the group is sufficiently cohesive that there exists a common thread or basic similarity in attitude or ideas, or experience which runs through the group; and (3) the exclusion of the group might cause juries to be biased against a petitioner from that group or could encourage public prejudice against the group. *See, e.g., Ford v. Seabold*, 841 F.2d 677, 682-83 (6th Cir. 1988); *accord Barber v. Ponte*, 772 F.2d 982, 986-87 (1st Cir. 1985); *Willis v. Zant*, 720 F.2d 1212, 1216 (11th Cir. 1983).

Petitioner has simply failed to show that nurses are a distinctive group, the first element required by *Duren*. The essence of a distinctive group is that its members share similar specific characteristics. *See Barber*, 772 F.2d at 986-87. Individuals in the nursing profession come from every possible race, gender, and ethnic group. Petitioner

---

[5] The Court also rejects petitioner's bald assertion that the over-representation of nurses resulted in bias during his trial. Petitioner claims that "the testimony of a nurse became at issue during the trial." (Petition, at 35.) However, as discussed *supra*, the portions of the trial record to which petitioner refers reflect the testimony of Dr. Tizes, who was a physician at Stony Brook University Hospital and not a nurse. (Tr. 3080 - 3107.)

has thus failed to show that nurses can be adequately defined and limited by some factor, such as race or gender. The extensive diversity that exists among individuals in the nursing profession is further increased by the vast number of, and diverse fields of, medicine in which nurses practice. This makes it unlikely that individuals in the nursing profession share the same attitudes, values, ideas and experiences, simply by virtue of their profession as nurses. *Cf. Anaya v. Hansen*, 781 F.2d 1, 6 (1st Cir. 1986) ("There are vast differences among blue collar workers politically, socially, and even in the type of work they perform.") Thus, petitioner cannot rely on the conclusory assertion that this group is sufficiently cohesive that there exists a common thread or basic similarity in attitude or ideas, or experience which runs through the group. Petitioner fails to set forth any specific evidence of nurses' characteristics within a particular community, and the Court cannot simply take judicial notice that a group defined simply as "nurses" meets even the first requirement of *Duren*.

Furthermore, petitioner has provided no authority to support his contention that any single occupation has ever been considered a cognizable group for purposes of this analysis. A review of the limited case law reveals that occupational groups generally do not constitute a distinct class, especially where the group or class lacks the need for special protection under the Fourteenth Amendment. *See Anaya*, 781 F.2d at 8 (holding that neither blue collar workers, less educated individuals nor young adults were "cognizable" groups); *Ford*, 841 F.2d at 682 (college students not distinctive group). In a related context, some courts have upheld the exemption from jury duty of occupational groups on the basis that such groups do not constitute a distinctive group. *See, e.g.*, *State v. Puente*, 69 Ohio St. 2d 136, 139 (Ohio 1982) (considering

exemption of doctors, dentists, and lawyers from jury service); *State v. Boyd*, 867 S.W.2d 330, 336 (Tenn. Crim. App. 1992) (considering systematic exclusion of doctors, lawyers, and the clergy).

Indeed, to classify nurses as a distinctive group would distort what the Supreme Court contemplated when it formulated the concept of "distinctive group" in *Duren* (where women were the subject of discrimination, and Supreme Court gave women heightened scrutiny in need of special protection). *See Anaya*, 781 F.2d at 6-7 ("findings of cognizability have been limited to special groups, like women and blacks, that have been subjected to discrimination and prejudice within the community . . . while it is appropriate for courts to establish special protective rules for such groups, we doubt the wisdom of expanding such rules to myriad other groups (like blue collar workers) that historically have not required the special protection of courts."); *Smith v. Murray*, No. Civ.A. 3:93CV710, 1995 WL 17162213, at *9 n.6 (E.D. Va. Mar. 17, 1995) ("The fair cross section violation claim has been extended only to race, and to gender.") (internal citations omitted). Thus, the Court concludes that nurses are not a "distinctive group" under the *Duren* test.[6]

---

[6] Even assuming *arguendo* that nurses did constitute a distinctive group for the purposes of this analysis and that plaintiff had demonstrated that the representation of nurses in the panel was not fair and reasonable in relation to the number of nurses in the community (prongs one and two of the *Duren* test), plaintiff's claim would still fail because "'a showing of mere statistical underrepresentation, without evidence of actual discriminatory or exclusionary practices' is insufficient to establish a cross-section violation." *Murray*, 1995 WL 17162213, at *9 n.6 (quoting *United States v. Cecil*, 836 F.2d

Moreover, petitioner's challenge on the grounds that a certain group was over-represented in the jury panel fails as a matter of law, because over-representation of a group does not implicate the Sixth or Fourteenth Amendment. This novel argument presented by petitioner is without a legal basis. In *United States v. Underwood*, 617 F. Supp. 713 (D.C. Ala. 1985), that court rejected the same argument that petitioner asserts in his instant petition. In *Underwood*, the court held that over-representation of white males "does not implicate the Sixth Amendment," because as noted in *Duren*, the Supreme Court "spoke in terms of 'exclusion,' not 'over-inclusion,' and of 'under-representation,' not 'over-representation.'" *Underwood*, 617 F. Supp. at 719. Additionally, the court in *Underwood* discussed the problem that the over-representation of one group will not necessarily lead to the under-representation of another group, and thus there are no concomitant constitutional implications. 617 F. Supp. at 719. Here, petitioner has not shown that the purported over-representation of nurses in the jury resulted in an exclusion or under-representation of some other group that would warrant protection as a distinct and cognizable group under the law. In short, petitioner has provided no support for his claim that the purported over-representation of nurses prejudiced him in any way. In fact, petitioner did not exhaust his peremptory challenges, and did not challenge any potential juror for cause because that person was a nurse. Thus, the Court finds that no constitutional violation is at issue.[7]

In sum, there is no basis to conclude the over-representation of nurses as a "distinct group" has constitutional implications for the purposes of being tried by a jury that represents a fair random cross-section of the community. Having reviewed petitioner's arguments on this issue on the merits, *habeas* relief based upon petitioner's challenge to the composition of his jury panel is denied.

## IV. CONCLUSION

For the foregoing reasons, Kotler's petition for a writ of *habeas corpus* is denied. Petitioner has failed to point to any state court ruling that was contrary to, or an unreasonable application of, clearly established federal law, or that resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. The Court has reviewed all of petitioner's claims and finds them to be without merit. Because petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue. *See* 28 U.S.C. § 2253(c)(2).

The Clerk of the Court shall enter

---

1431, 1446 (4th Cir. 1988), *cert. denied*, 487 U.S. 1205 (1988) (quoting *United States v. Lynch*, 792 F.2d 269, 271 (1st Cir. 1986))).

[7] To the extent that petitioner's claim can also be construed as an equal protection challenge under the Fourteenth Amendment, that claim also is

without merit. In order to prevail on an equal protection challenge in this context, petitioner must show that the procedure employed resulted in the substantial under-representation of his race or of the identifiable group to which petitioner belongs. *Castaneda v. Partida*, 430 U.S. 482, 494 (1977); *accord Alston v. Manson*, 791 F.2d 255, 259 (applying *Castaneda* to jury array context). As discussed *supra*, petitioner has utterly failed to make any such showing in the instant case or provide any basis for an equal protection challenge.

judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: April 15, 2009
Central Islip, New York

\* \* \*

Petitioner appears *pro se*. The attorney for respondent is Thomas C. Costello, Assistant District Attorney, Office of the District Attorney of Suffolk County, 200 Center Drive, Riverhead, NY 11901.